This is a petition for writ of mandamus to compel the respondent trial judge to issue an order compelling defendant E.M. Toler, M.D., to produce the original of a certain medical record so that it may be delivered or transferred to plaintiff's documents expert in Landrum, South Carolina, for laboratory testing, inspection, and photographing. The writ is granted.
The petition alleges the following facts: *Page 1099 
On January 14, 1985, petitioner, Larry M. Johnson, as administrator of the estate of Janice C. Johnson, deceased, filed a complaint in Mobile Circuit Court against Dr. E.M. Toler, Dr. P.J. Dempsey, and some other fictitiously named defendants. In his complaint, petitioner alleges that the defendants were negligent in their course of diagnosis and treatment of a lump discovered in Janice Johnson's left breast on July 22, 1981, which lump was in fact a malignant tumor that spread to other vital organs, ultimately causing her death on November 21, 1983.
(Because the course of treatment received by Janice Johnson from the defendant Toler is germane to the relevance of the discovery request at issue, it is summarized herein based on the facts as stated in the petition.)
Janice Johnson first consulted Dr. Toler about the lump in her left breast on July 22, 1981. On that day, Dr. Toler observed a small swollen and thickened mass in the left breast, which was painful to Ms. Johnson. Dr. Toler gave Ms. Johnson a drug to enhance a later breast examination and instructed her to return in two weeks. When she returned on August 5, 1981, Dr. Toler was still unable to determine the composition of the lump; therefore, he sent her to Dr. P.J. Dempsey, also a defendant herein, for a screening sonogram. That test revealed what Dr. Dempsey thought to be a cyst. The test results were communicated to Dr. Toler, whereupon he scheduled Ms. Johnson for a third examination on August 20, 1981. That examination was the last visit Ms. Johnson had with Dr. Toler until January 11, 1982. During the five-month interim, the lump in her left breast doubled or tripled in size and metastasized to other organs of her body, transforming into a full scale malignant tumor. When Ms. Johnson returned to Dr. Toler's office on January 11, 1982, Dr. Toler examined her left breast and diagnosed the lump as a tumor suspected of carcinoma and sent her to a surgeon, Dr. Lyden. Dr. Lyden thereafter diagnosed the lump as a malignant tumor. Consequently, Ms. Johnson underwent a radical mastectomy, chemotherapy, and radiation treatments until her death.
The critical point in controversy in this case, giving rise to the particular discovery request at issue, concerns the alleged treatment and/or instructions (or lack thereof) given Ms. Johnson by Dr. Toler during the August 20, 1981, examination. Prior to her death, Janice Johnson deposed that during the August 20th examination, Dr. Toler instructed her to watch the breast closely and to return if she noticed anychanges. The relevant portions of her deposition are contained in the record prepared for this petition and are set out in pertinent part below:
 "A. . . . His nurse called me the next day and said Jan, it's good news. It's just a cyst. You come back and Doctor Toler will drain it.
 "Q. All right. That would have been the day after you had the ultrasound?
"A. That she called me, yes.
". . . .
"Q. Did you subsequently go see Doctor Toler?
"A. Yes, I did.
"Q. And did he examine your breast again?
"A. Yes, he did.
 "Q. Did he have any discussion with you relative to the results of the ultrasound?
 "A. He said watch it closely. If you notice any changes, come back.
 "Q. Did he tell you he wanted to see you again in about six weeks?
 "A. No, sir. He just said that if I notice any changes to come back.
". . . .
 "Q. Did he say anything to you about what the results of the test had shown?
"A. No, sir.
". . . .
 "Q. And Doctor Toler did nothing physically to you or any type of treatment other than, as you recall, perhaps examined your breast again? Did he do that by palpation or manipulation, feeling your breast? *Page 1100 
"A. Yes, sir.
 "Q. And he said to watch it closely. Did he say come back if you have any trouble?
"A. If I notice any change.
 "Q. And it's your recollection that he didn't say anything about coming back in six weeks or so and let me look at it?
"A. No, sir.
". . . .
 "Q. Why did you go back to see him [in January 1982]?
"A. My nipple became drastically inverted.
 "Q. Had you noticed any change in the size of the lump in your breast?
"A. No, sir.
 "Q. You testified that you went back to see Doctor Toler following the ultrasound treatment, is that correct?
"A. Yes, sir.
 "Q. Uh-huh. What, if anything, did he tell you on that occasion?
"A. Nothing.
"Q. Did he tell you to watch it closely?
"A. Yes, sir. He said —
"Q. And he did take —
"A. If I noticed any change to come back.
"Q. And he said to watch it closely?
"A. Yes, sir.
 "Q. And did you watch it closely over the ensuing some four to five months?
"Q. Yes, sir.
 "Q. And you noticed absolutely no change until this nipple inverted and became completely inverted over a period of about a week?
"A. It stayed full.
 "Q. Okay. And when you noticed that did you immediately make an appointment to go back and see Doctor Toler?
"A. The inverted nipple?
"Q. Yes, ma'am.
"A. Yes, sir, I did.
". . . .
 "Q. I want to ask you this. Did Doctor Toler ever express any dissatisfaction with you or make any statement to you in any way related to your not following his instructions or not doing what you were supposed to?
"A. No, sir, he didn't.
 "Q. He never did say, Jan, you didn't do what I told you. You should have come back sooner or anything like that?
"A. No, sir.
"Q. Never has to this day, to you?
"A. No, sir.
 "Q. And he did that in January when you first went back to him with the inverted nipple?
"A. No, sir.
". . . .
 "Q. Did you follow the instructions that he gave you in August of '81?
"A. Yes, I did.
 "Q. As soon as you noticed the change you went back?
"A. Yes, sir.
 "Q. Did he, in August of '81 or anytime before that, give you any film or talk or explanation on how to keep checking this lump or what to look for?
"A. No, sir.
"Q. He just said if there was a change?
"A. Yes, sir.
"Q. Did he tell you what kind of change?
"A. No, sir." (Emphasis added.)
Dr. Toler, on the other hand, deposed that during his August 20th visit with Ms. Johnson he instructed her to follow the cyst closely and to return in six weeks.
 "Q. What did you tell Janice Johnson about her condition on August 20, or anybody in your office, from the time that sonogram was done until August 20th? When she walked out of the door, what was she told about her condition as to what it was or [was] thought to be?
 "A. That she had a cyst in her breast and it should be followed closely and to please return in six weeks or after her next period. I only have six weeks, so I can only testify to that, okay. *Page 1101 
 "Q. Okay. The best you know, that's what she was told?
"A. As best I know.
"Q. Was she told that that cyst could be malignant?
 "A. No. You don't want to scare them to death, okay, but you certainly know that that needs — I don't think anybody in the world would argue with you that if you turn somebody out on the street with a mass —
 "Q. I am just trying to get what was conveyed to her.
"A. I am trying my best to convey that."
As the above quoted portions of the depositions of Dr. Toler and Janice Johnson indicate, there is a sharp dispute as to the time at which, according to Dr. Toler's instructions, Ms. Johnson was to return to his office for further examination. The six-week time frame is supported by a notation appearing in Dr. Toler's medical record of Ms. Johnson's office visits. This medical record consists of a series of notations made by Dr. Toler and his nurse reflecting the date and purpose of each of Ms. Johnson's visits, her vital signs and statistics, and various comments by Dr. Toler concerning her condition at the time of each visit, as well as any instructions pertinent to her condition. A copy of the notations made on the dates in question is reproduced below: *Page 1102 
[EDITORS' NOTE: NOTATIONS IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 1103 
During his deposition, Dr. Toler was questioned about, and asked to read from, the medical record shown above, specifically the notations dated August 20, 1981:
 "Q. All right. Let's read that August 20 entry very carefully.
"A. All right. `Breast much improved.'
"Q. That's on —
"A. `Less matting.'
 "Q. Wait a minute `Breast much improved' appears on the line immediately under August 20, 1981; is that right?
"A. That's right.
"Q. And that is your writing?
"A. That is my writing.
"Q. Now, the next line.
 "A. `Less matting. Return to office six weeks. Will follow closely.'"
In his complaint, the petitioner essentially claims that defendant Toler was negligent in failing to aggressively treat the lump in the decedent's left breast after its initial discovery in July 1981, and after the examinations on August 5 and 20, and, that as a result, the decedent's cancer spread beyond cure or control. The petitioner also contends, however, that Dr. Toler will attempt to prove that the decedent was contributorily negligent in failing to return to Dr. Toler's office within six weeks, as he allegedly instructed her to do, thereby preventing earlier treatment.[1] The petitioner believes that, in support of the defendant's claim that the decedent was contributorily negligent, Dr. Toler will introduce into evidence not only his own testimony that, as best he knew, he told the decedent to return in six weeks, but also the office entries of August 20, 1981, reproduced above, which reflect that that instruction was given.
Petitioner alleges that the August 20 entry, "R.T. office 6 wks. Will follow closely," is written in ink that is of a slightly different shade than the rest of that entry. At petitioner's request, Dr. Toler produced the original medical record in question in Mobile on December 15, 1983. At that time, petitioner's documents expert, Mr. Ordway Hilton, examined the record at length, using various cameras and equipment. Based on that initial examination of the document under magnification, Mr. Hilton was able to conclude that, in his expert opinion, the critical entry of August 20, 1981, was written after the January 11, 1982, entry was written. However, Mr. Hilton explained to Petitioner's counsel that, in order to show the evidence to a court and jury so that they would be able to evaluate it, he needed to make one or more enlarged photographs of key sections of the writing. Mr. Hilton also explained that the kind of macrophotographs he needed to make required the use of special document cameras and lenses which he had in his laboratory in Landrum, South Carolina, but which were not, to his knowledge, available in Mobile.
On May 4, 1984, petitioner's counsel wrote Dr. Toler's counsel, briefly explaining Mr. Hilton's requirements and requesting that the original medical record be sent to Mr. Hilton's laboratory in Landrum, South Carolina. In that letter, petitioner's counsel also explained that the required photographing could be accomplished in one day, and he further offered to have a runner personally deliver the record, if the United States mail, Federal Express, or other methods of conveyance would not be satisfactory. Counsel for Dr. Toler refused the request, stating that he did "not want to let the original of this record from [his] possession" and out of his control, but that he would permit further examinations of the record in his offices.
Petitioner's counsel then wrote Mr. Hilton requesting that he bring his photographic equipment to Mobile if it was possible to do so. Mr. Hilton responded that he *Page 1104 
could not bring the necessary equipment to Mobile because the laboratory mounts for the cameras were not portable. He explained that the only way to record the necessary details of the line intersections was to make an enlarged photograph directly from the document. He further stated that the photographs he needed to take could not be taken in the field, but rather had to be taken in a laboratory because "there is a need in problems of this type to make several photographs of the writing in question under different lighting conditions."
Accordingly, on June 5, 1984, petitioner filed a request for production of the original record in question, and the defendant Toler opposed this request. Then, on September 25, 1984, petitioner filed a motion to compel production, which was also opposed by the defendant. On November 30, 1984, the respondent trial judge ordered that the record be produced any place in Mobile but denied petitioner's request to take the record to Mr. Hilton's laboratory in Landrum, South Carolina. Petitioner's counsel informed Mr. Hilton of the trial court's order and requested that he make the enlarged photographs and photographic studies in Mobile, if he felt there was a suitable photographic or scientific laboratory in Mobile.
According to Mr. Hilton's letter of February 19, 1985, there is no properly equipped document laboratory in Mobile, nor any commercial photographic laboratory equipped with special document cameras and lenses necessary to make the enlarged photograph directly from the document. By letter dated February 21, 1985, Mr. Hilton informed petitioner's counsel that another attempt at preparing an enlargement from the "field" photograph of Dr. Toler's medical record had failed and that an enlarged photograph of the original was essential.
Based on the above information, on March 1, 1985, petitioner filed with the trial court a motion to reconsider its order denying petitioner's motion to compel. The trial court denied the motion on March 29, 1985. Petitioner filed another motion to reconsider on April 3, 1985, which the trial court denied on April 9, 1985. Thereafter, on July 24, 1985, petitioner filed this petition for writ of mandamus.
 I.
The respondents have moved this Court to dismiss the petition on several grounds:
 "(1) The petition fails to comply with the Alabama Rules of Appellate Procedure, Rule 21.
"(2) The petition is barred by laches.
 "(3) Mandamus does not lie to challenge the discretionary [rulings] of the trial court herein.
 "(4) The petition is not verified as required by § 6-6-640, Code of Alabama, 1975."
Although the Alabama Rules of Civil Procedure vest the trial court with "broad discretionary powers to control the use of the [discovery] process and prevent its abuse by any party," mandamus is, nevertheless, a proper means of review to determine whether a trial court abused that discretion in limiting a party's right to discovery. Ex parte Mack,461 So.2d 799, 800 (Ala. 1984), citing Ex parte Dorsey Trailers, Inc.,397 So.2d 98 (Ala. 1981), and Rule 26 (c), A.R.Civ.P. For that reason, grounds (1) and (3) of respondents' motion to dismiss must fail.
Respondents argue that this petition was not timely filed and is, therefore, due to be dismissed, citing Evans v. InsuranceCompany of North America, 349 So.2d 1099 (Ala. 1977), and other cases. In Evans, this Court, citing a long line of decisions, explained that "[m]andamus is an extraordinary remedy and onlyunreasonable delay is a ground for dismissing a petition for such relief." (Emphasis added.) 349 So.2d at 1101. The only factor or circumstance the respondents allege to be unreasonable is the fact that this petition was filed some seven months after the trial court's November 30, 1984, order denying petitioner's motion to compel and over *Page 1105 
three months from the denial of his last motion for reconsideration.
The record reveals that, during the period of time between the denial of petitioner's motion to compel and the bringing of this petition, petitioner was active in his attempts to come up with alternative means of accomplishing what his discovery request sought. However, unable to do so, and, on that basis, unable to get the trial court to reconsider, this petition was the only remaining alternative. Furthermore, respondents have failed to show any prejudice resulting from the delay, nor have they shown the existence of any other circumstances which would show unreasonableness. Evans, supra. The mere passage of time, without more, will not suffice. Therefore, respondents' laches claim must fail.
Respondents also maintain that the petition is due to be dismissed because it is not verified, the respondents contending that verification is required by § 6-6-640, Code of 1975. That section is set out in part below:
 "(a) All applications for mandamus, prohibition, certiorari or other remedial writ of a supervisory nature shall be commenced by a petition, verified by affidavit, in which the facts shall be stated as briefly and succinctly as the case will admit of. . . ." (Emphasis added.)
The application of that section to mandamus actions filed in the appellate courts has not been addressed in light of the enactment of Rule 21 of the Alabama Rules of Appellate Procedure. That rule sets out, with particularity, the appropriate steps and procedures the parties shall follow when applying for a writ of mandamus, among other things, as well as the manner in which it shall be handled by the court. It states, in part:
 "(a) Mandamus or Prohibition to a Judge or Judges; Petition for Writ; Service and Filing. Application for writ of mandamus or of prohibition directed to a judge or judges shall be made by filing a petition therefor with the clerk of the appellate court having jurisdiction thereof with certificate of service on the respondent judge or judges and on all parties to the action in the trial court. The petition shall contain a statement of the facts necessary to an understanding of the issues presented by the application; a statement of the issues presented and of the relief sought; a statement of the reasons why the writ should issue; and copies of any order or opinion or parts of the record which would be essential to an understanding of the matters set forth in the petition."
This rule does not mention the verification requirement contained in § 6-6-640, but, in all other respects, appears to restate and expand upon all the requirements set out in §6-6-640, thus eliminating any effect that statute may have had as to mandamus petitions filed in appellate courts. However, respondents point out that § 6-6-640 is not listed among the statutes and rules superseded or statutes modified by the Alabama Rules of Appellate Procedure. Nevertheless, we find that the caveat contained in the Committee Comments appearing before the lists of statutes and rules superseded or modified by the Alabama Rules of Civil Procedure is equally applicable to the lists prepared by the Rules Committee for the Alabama Rules of Appellate Procedure, although the latter lists are not preceded by a Committee Comment. That comment preceding the civil rules states in part:
 "When the Federal Rules went into effect, no list of superseded or modified statutes was made available. Prof. Moore reports as follows:
 "`While a list of such statutes would have been convenient and helpful to the bar, the compilation of such a list would have been a most arduous task, and attended by the constant danger of overlooking some statutes, as there was a multitude of procedural provisions scattered throughout the United States Code, and imbedded in long statutes, often in the most unexpected places. Moreover, it is not always easy, in the absence of a case raising *Page 1106 
the precise point, to determine whether a particular provision is wholly or only partially superseded, or merely modified to some extent. In the great majority of cases no hardship was caused by the absence of a list of superseded or modified statutes, as the effect of the Federal Rules on the important procedural statutes was clear without any express statement to that effect; and in most situations the Committee's Notes are helpful.' (2 Moore's Federal Practice, Para. 1.02[5], p. 129 [2d ed. 1970])
 "With due regard to the extreme difficulty in compiling such a list as noted by Prof. Moore, the most reasonable course for Alabama practice and the requirement of Act 1311, dictated the promulgation of this Appendix of Superseded Rules and Statutes. While this Appendix should be entitled to greater authority than the commentary, the bench and bar should apply common sense in its application. The Committee has sought to eliminate as many unedifying trips to the Court as possible on questions of reconciling the new rules to the Alabama Code. However, it is not beyond the realm of possibility that common sense will dictate a second look at that which has been broadly labeled `superseded' or that which may have been inadvertently omitted from this Appendix. This is by no means an invitation to engage in repeated challenges to the validity of this Appendix but is simply a practical admonition that must inevitably accompany an Appendix of this nature."
In short, the Rules Committee may have missed some, and it appears it did in the case of § 6-6-640, if the parties are correct in assuming that § 6-6-640 otherwise would have applied to petitions filed in the appellate courts. Thus, we hold that the verification requirement of § 6-6-640 does not apply as to mandamus petitions governed by the Alabama Rules of Appellate Procedure, and the petition is not due to be dismissed because of petitioner's failure to have it verified.
 II.
The only remaining issue is whether the trial court abused its discretion in denying the discovery sought by petitioner. The standard to be applied in reviewing the trial court's order, as well as the general scope of discovery, is set out with clarity in Ex parte Dorsey Trailers, Inc., 397 So.2d 98
(Ala. 1981):
 "The utilization of a writ of mandamus to compel or prohibit discovery is restricted because of the discretionary nature of a discovery order. The right sought to be enforced by mandamus must be clear and certain with no reasonable basis for controversy about the right to relief. The writ will not issue where the right in question is doubtful. Lassiter v. Werneth, 275 Ala. 555, 156 So.2d 647 (1963).
 "As the court stated in Campbell v. Regal Typewriter Co., Inc., 341 So.2d 120 (Ala. 1976):
 "`The Alabama Rules of Civil Procedure permit very broad discovery and the rules must be broadly and liberally construed. Cole v. Cole Tomato Sales, Inc., 293 Ala. 731, 310 So.2d 210 (1975). However, Rule 26 (c) recognizes that the right of discovery is not unlimited and gives the court broad power to control the use of the process and to prevent its abuse by any party. The rule does not allow an arbitrary limit on discovery, but instead vests the trial court with discretion in the discovery process. . . .'
 "For this reason, mandamus will issue to compel discovery only in those cases where a clear abuse of discretion is shown. Ex parte Alabama Power Co., 280 Ala. 586, 196 So.2d 702 (1967).
". . . .
 "`Generally speaking, the purpose of modern discovery is to assist the administration of justice, to aid a party in preparing and presenting his case or his defense, to advance the function of a trial in ascertaining truth, and to accelerate the disposition of suits. Beyond this, the rules for discovery are designed to *Page 1107 
eliminate, as far as possible, concealment and surprise in the trial of lawsuits to the end that judgments be rested upon the real merits of cases and not upon the skill and maneuvering of counsel.' 23 Am.Jur.2d, Depositions and Discovery, § 155 (1965). Stated otherwise, the rules seek to `make a trial less a game of blind man's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.' United States v. Procter and Gamble Co., 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947).
 "It is the trial court's job to exercise its broad discretion in a manner that will implement this philosophy of full disclosure of relevant information and at the same time afford a party, or others, maximum protection against harmful side effects which would result from unnecessary disclosure. Ex parte Guerdon Industries, Inc., 373 So.2d 322 (Ala. 1979)." (Emphasis added.) 397 So.2d at 102-03.
In order to determine whether a clear abuse of discretion is present in this case, we must examine the particular requested discovery in light of the purpose and language of the applicable rules of discovery in the Alabama Rules of Civil Procedure and cases construing our rules or the federal rules.Bracy v. Sippial Electric Co., 379 So.2d 582 (Ala. 1980).
Rule 26 (a), A.R.Civ.P., provides that "[p]arties may obtain discovery by . . . production of documents or things . . . for inspection and other purposes." Rule 26 (b)(1) provides that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense ofany other party."
Rule 26 (c) also provides for protective orders:
 "Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition or production or inspection, the court in the circuit where the deposition or production or inspection is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that the discovery not be had; (2) that the discovery may be had only on specified terms and conditions, including a designation of the time or place; (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery. . . ." (Emphasis added.)
Rule 34 (a), A.R.Civ.P., sets out the scope of discovery with respect to requests for production of documents and things for inspection and other purposes:
 "Any party may serve on any other party a request . . . (1) to produce and permit the party making the request, or someone acting on his behalf, to inspect and copy, any designated documents (including writings, drawings, graphs, charts, photographs, phono-records, and other data compilations from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonably usable form), or to inspect and copy, test, or sample any tangible things which constitute or contain matters within the scope of Rule 26 (b) and which are in the possession, custody or control of the person upon whom the request . . . is served. . . ." (Emphasis added.)
Rule 34 (b)(1)(B) goes on to state that if the party to whom such a request is made responds to the request by objecting to it, the response must state "the reasons for an objection." The only reason for objection stated by Dr. Toler in his response to the petitioner's request for production and his motion to compel was that Dr. Toler had "by agreement, previously made available to plaintiff's counsel and his expert witness the same records which plaintiff *Page 1108 
now seeks to again have produced and inspected." Defendant Toler stated no reason, however, for his objection to the plaintiff's request to send the original record to his expert's laboratory in Landrum, South Carolina.
As we explained in Ex parte Dorsey Trailers, Inc., supra, the trial court must "exercise its broad discretion in a manner that will implement the philosophy of full disclosure of relevant information," while affording others "maximum protection against harmful side effects which would result from unnecessary disclosure." Here, defendant Toler does not claim that "harmful side effects" would result from allowing the kind of discovery requested by the petitioner. He merely states that his counsel "for obvious reasons did not, and does not, want the document to leave his possession and control" (emphasis added), while on the other hand, contending, in essence, that the document in question is not vital to the defense's case: "[T]his case, contrary to Petitioner's assertion, does not hinge on a particular entry in the doctor's chart and is not the `most heated factual issue in the case.'"
In view of the fact that under Alabama law a finding of contributory negligence on the part of the decedent would be a total bar to a recovery in negligence, the authenticity or validity of the date the critical entry was made is clearly relevant to the issues in this case. At the very least, it is documentary evidence substantiating the credibility of defendant Toler's testimony concerning the instructions given the decedent. Furthermore, the jury will have the opportunity to observe the demeanor of defendant Toler, should he testify at trial, while the conflicting testimony of the decedent is available to the jury only in the form of a deposition.
In looking at the question of whether allowing the document to be sent to Landrum, South Carolina, poses any risk of harm to the defendant, it is worthwhile to examine cases on this point from the federal system as well as from other jurisdictions.
A case somewhat similar to the present case is Equitable LifeAssurance Society of the United States v. MacMahon, 325 Mich. 90, 37 N.W.2d 769 (1949). In that case, an interpleader suit, an issue arose involving the execution of a change of beneficiary form. The insured/decedent had requested the form from Equitable, explaining that he desired to change the beneficiaries named in his policy, who were at that time his three children. Equitable sent the form, together with a letter explaining its requirements and stating, among other things, that "the form should be signed in ink and should be free from alterations or erasures." Approximately one year later, Equitable received the policy, together with the request for change of beneficiary executed on its form, naming Anna Jane Healy, one of the defendants, as the proposed beneficiary. The form, however, bore evidence that certain writing had been erased, and that the words "no relationship" had been written over the erasure with a different pen and ink from that used for the signature. Equitable wrote the insured/decedent, telling him that the request form was unacceptable, and enclosed another form. A month later, Equitable was notified that the insured/decedent had died two days prior to the date of Equitable's letter, and forms for making a claim on the policy were requested.
Thereafter, Anna Jane Healy brought an action on the policy, and Equitable, unable to determine whether Healy or the MacMahon children were entitled to the proceeds, filed its bill of interpleader. After Equitable paid the proceeds into court and was dismissed as a party, the MacMahons, pursuant to Michigan Court Rule 40 (1945),[2] filed a petition for an order to *Page 1109 
produce the change of beneficiary document in Toronto, Canada, for examination by a documents expert there. The reason given was that it was not practical for the expert to bring his large and bulky equipment to the state of Michigan to perform certain tests. The trial court granted the petition; however, the Supreme Court of Michigan reversed that order, reasoning that the discovery request in that case would place documents necessary to the decision of the case beyond the jurisdiction of the court:
 "In the trial of the issues involved, the application for insurance by Frederick J. MacMahon, the insurance policy and the so-called change of beneficiary would of necessity be exhibits and should be under the control of the court so that they could be produced for inspection and identification. Under Court Rule No. 40, 1945, any party to a law action or chancery suit may make application for the production of books and papers in order to prepare for trial of the cause. The order issued by the trial court in the case at bar would place vital papers beyond the jurisdiction of the court and thus deny to appellant the right to a subpoena duces tecum. In our opinion it was error to issue an order that would place such possible exhibits beyond the power of the court to regain them." 325 Mich. at 93, 37 N.W.2d at 770.
In the present case, defendant Dr. Toler even argues that resolution of the issues presented at trial "will not rest on any entry in the chart of Janice Johnson." More importantly, while the petitioner seeks to have the document tested in another state, he does not request that it be sent to anothercountry, and, under these facts, the court will retain jurisdiction over the parties and thus retain the power to issue orders with respect to the document. See also Wilson v.Naifeh, 539 P.2d 390 (Okla. 1975), where the Supreme Court of Oklahoma rejected a Missouri court's narrow interpretation of pretrial inspection and examination rules in connection with the inspection of the defendant's out-of-state facilities (e.g., holding that to "produce" contemplated only that the possessing party must "bring forward" or "offer to view or exhibit," rather than "turn over" or "give"), but nevertheless went on to hold that "to permit a party litigant, seeking pre-trial inspection and examination of an object, to transport the subject of the discovery order outside the territoriallimits of the United States [specifically, to Mexico] constitutes an abuse of discretion." (Emphasis added.) 539 P.2d at 391-92.
Furthermore, permitting the medical record in question to be sent or delivered to petitioner's expert in Landrum, South Carolina, would not disrupt Dr. Toler's business. In NiagaraDuplicator Co. v. Shackleford, 160 F.2d 25 (D.C. Cir. 1947), the Circuit Court of Appeals held that, where the subjects of the plaintiff's Rule 34, F.R.Civ.P., discovery motion were part of the defendant's general books of account used in connection with its entire business and were located in San Francisco, California, it would be unreasonable to compel the defendant to produce all of the books and records in Washington, D.C. InShackleford, the defendant opposed the plaintiff's Rule 34 motion with an affidavit stating "that it was impossible to segregate the records pertaining to the Washington Branch without materially and seriously *Page 1110 
interfering with the conduct of its general business operations." 160 F.2d at 26.
Another case in point is Weiner v. Bache Halsey Stuart, Inc.,76 F.R.D. 624 (S.D. Fla. 1977), wherein the court ruled that the plaintiff need not comply with the defendant's request that plaintiff's produce the original bonds in the custody of a Swiss bank due to the risk of loss and the cost factor. Instead, the court ordered the plaintiff to deliver certified copies of the bonds in question. Nevertheless, the court recognized that the certified copies might be insufficient for the defendant's purposes and further ruled that, "[i]f, upon receiving these copies, defendant finds that it cannot read certain pencil notations or, for some other reason, finds that it needs the originals, it can apply to the court at that time." 76 F.R.D. at 726. Accord, La Chemise Lacoste v. GeneralMills, Inc., 53 F.R.D. 596 (D.C.Del. 1971), affirmed,487 F.2d 312 (3d Cir. 1973); William A. Meier Glass Co. v. AnchorHocking Glass Corp., 11 F.R.D. 487 (W.D.Pa. 1951).
Important to remember is the provision in Rule 26 (c), supra, which permits the trial court to fashion an order with respect to the discovery sought that will "protect a party . . . from . . . undue burden or expense" by specifying "terms and conditions" under which the discovery sought may be had. In this case, the petitioner has agreed to pay all expenses of transportation and to allow defendant Toler to choose an individual to hand deliver the record, if necessary. Also, the expert, Mr. Hilton, has guaranteed that the tests he wishes to perform will in no way damage or alter the document. Thus, the cost to defendant Toler is nothing and the risk of loss deminimis. Accordingly, the trial court abused its discretion in refusing to issue an appropriate order allowing the discovery sought. Therefore, the writ is due to be, and it is hereby, granted.
WRIT GRANTED.
TORBERT, C.J., and FAULKNER, ALMON and HOUSTON, JJ., concur.
[1] In their brief in response, the defendants point out that, while they have not filed a contributory negligence defense, they do not dispute that "Defendants will contend that Mrs. Johnson did not return to the doctor for further treatment from August 20, 1981 until January 11, 1982 when the cyst/tumor had tripled in size and the breast had developed an `orange peel' appearance and the nipple completely withdrawn into the breast."
[2] Michigan Court Rule 40 (1945) states, in pertinent part:
 "Section 1. Application may be made by petition to any court of record in term time, or to the judge thereof in vacation, to compel the production and discovery of books, papers and documents relating to the merits of any action or suit pending in such court, or of any defense to such action or suit, in the following cases:
 "(a) By the plaintiff, to compel the discovery of papers or documents in the possession of or under the control of the defendant, which may be necessary to enable the plaintiff to declare or answer to any pleading of the defendant.
 "(b) The plaintiff may be compelled to make the discovery of papers or documents, where the same shall be necessary to enable the defendant to answer any pleading of the plaintiff.
 "(c) The Plaintiff may be compelled, after declaring, and the defendant, after pleading, to produce and discover all papers or documents on which the action or defense is founded.
 "(d) After issue joined in any action, either party may be compelled to produce and discover all such books, papers and documents as may be necessary to enable the party applying for such discovery to prepare for the trial of the cause."